Adolf LONY, Appellant,

v.

E.I. DU PONT de NEMOURS
& COMPANY.

No. 89–3061.

United States Court of Appeals,
Third Circuit.

Argued June 1, 1989.

Decided Oct. 2, 1989.

As Amended Oct. 11 and Oct. 20, 1989.

Paul F. Doyle (argued), Kelly, Drye & Warren, New York City, for appellant.

William H. Sudell, Jr. (argued), J. Judson Scaggs, Jr., Morris, Nichols, Arsht and Tunnell, Wilmington, Del., for appellee.

Before HIGGINBOTHAM, GREENBERG, and HUTCHINSON, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

### I. INTRODUCTION

Plaintiff Adolf Lony, a small West German business, appeals from the dismissal by the district court of its suit in United States District Court for the District of Delaware against E.I. Du Pont de Nemours & Co., a Delaware Corporation, on grounds of *forum non conveniens*. For reasons that follow, we find that the district court erred in failing to consider adequately and to determine the amount of deference due the choice of forum of a foreign plaintiff when suit is brought on the defendant's home ground and much of the evidence is located there. We also find that it clearly erred in the conclusion it drew from its weighing of the private interest factors and in its assessment of the applicability of local law in its weighing of the public interest factors. Because these errors constitute an abuse of discretion that alters the outcome of the *forum non conveniens* analysis, we will vacate the order of dismissal and remand this case for further proceedings.[1]

### II. FACTS AND PROCEDURAL BACKGROUND

Appellant Adolf Lony ("Lony") is a sole proprietorship with its principal place of business in the Federal Republic of Germany ("Germany"). Joint Appendix ("App.")

---

1. We have considered and will deny appellant's motion for leave to submit a letter of the ambassador of the Federal Republic of Germany to the United States.

at 909. It prints and processes cellophane and plastic films into wrappers for food and other products. App. at 910–11. Appellee E.I. Du Pont de Nemours & Co ("Du Pont") is a Delaware corporation with its principal place of business in Delaware. App. at 909–10. In addition, Du Pont's research laboratories and its Flexible Packaging Division headquarters are located in Delaware. App. at 481, 354–56. Du Pont is the largest private employer in the state. App. at 481.

In 1985, Lony purchased some Du Pont cellophane from Transparent Paper Ltd. ("Transparent"), a Swiss distributor of cellophane for Du Pont and other manufacturers. App. at 911, 9–10. At that time, Lony's largest client was Haribo GmbH. & Co. KG ("Haribo"), a West German candy producer with its principal place of business in Germany, which manufactures, among other products, the children's candy "Gummibaerchen" or Gummy Bears. App. at 911. Lony claims that it used the Du Pont cellophane it purchased through Transparent to make wrappers for Haribo candy. *Id.;* App. at 5.

Lony claims that in August of 1985, Haribo asked Lony whether the cellophane packaging provided by Lony for its candy contained diethylene glycol ("DEG"), and specified that the cellophane used for Haribo candy must be free of DEG. App. at 10, 13. The concern was apparently prompted by a widely publicized scandal at that time over the presence of DEG in some European foods and wines. App. at 910. Lony claims that it asked Transparent whether or not the Du Pont cellophane was free of DEG, and that Transparent forwarded the question to Du Pont and forwarded Du Pont's reply to Lony. App. at 10–11. In October 1985, William Percival, of the Regulatory Affairs Group of Du Pont's Polymer Products Department in Wilmington, wrote to Transparent:

> In response to your question to W. Pierce, I am informing you that there is no diethylene glycol in any type of Du Pont Company Cellophane Film handled by your Company.

I trust this provides the assurance you were seeking.

App. at 557. Lony claims that Percival was aware that he was responding to a customer's inquiry because he stated in a postscript, "[t]hanks for your explanation regarding the reason for your questions." *Id.;* Appellant's Brief ("Applt's Br.) at 4.

Lony alleges that in December 1985 and January 1986, following Du Pont's assurances, Lony shipped candy wrappers made with Du Pont cellophane to Haribo; in May 1986, Haribo tested the candy wrappers it had received from Lony, found they contained DEG, severed its business relationship with Lony, and drove Lony to the brink of bankruptcy. App. at 13–14. Lony asserts that Haribo returned the unused wrappers. App. at 309–10, 341–42. Subsequently, Lony and Haribo renewed their business relationship. App. at 896.

Lony also makes the following claims. As a result of Lony's experience, Du Pont tested several types of its cellophane for DEG at its research facilities in Wilmington in the fall and summer of 1986 but reported in a letter from Mr. Percival to Transparent that it had found none. App. at 588–89. While investigating the cause of its loss in 1987, Lony learned that the source of the DEG in the Du Pont cellophane might be polyethylene glycol ("PEG") used in the manufacturing process. Applt's Br. at 6. Of the 50 types of cellophane manufactured at Du Pont's plant in Tecumseh, Kansas, six used PEG 300 as a softener, including type K160DB23 that was shipped to Lony from Tecumseh in July 1985, but none of the six was among those tested by Du Pont in 1986 and reported as being free of DEG. App. at 108, 135–56, 813.

In June 1986, Du Pont sold its entire cellophane business to Flexel, Inc. ("Flexel"). App. at 597–601. Lony asserts that all of Du Pont's records relating to the cellophane business were transferred to Flexel and that Flexel now employs personnel who worked for Du Pont at the time period relevant to this litigation. App. at 85, 98, 597–601.

Lony brought this suit in Delaware on June 15, 1988, claiming tortious misrepresentation, common law fraud, statutory fraud, breach of warranty, and breach of fiduciary duty. In response to Du Pont's *forum non conveniens* motion, the district court stayed discovery in the case except that related to identifying witnesses, records and their location. App. at 78, 402. After briefing and oral argument on the motion, the court granted it on November 14, 1988, subject to a number of conditions (App. at 930–31): the West German courts must entertain at least one of Lony's claims; Du Pont must submit to jurisdiction in West Germany; it must facilitate trial proceedings in West Germany by making available at its own expense any documents, witnesses or other evidence in its custody or control that a West German court determines might be needed and by providing translations where appropriate; it must agree to pay any damages, costs and fees awarded by West German courts; finally, Du Pont must consent to Lony's reinstitution of the suit in the United States without prejudice should any of the other conditions fail. *Id.* Upon judgment entered, Lony appealed.

Lony alleges that critical evidence necessary to proving its claims is located in the United States, primarily in Wilmington and in Tecumseh, Kansas. Applt's Br. at 9–19. It identified witnesses and documents regarding the following: Du Pont's decision to use PEG in the manufacture of cellophane; its purchasing of PEG; its use of PEG in the manufacturing process; the way in which the use of PEG in the manufacturing process resulted in DEG in the cellophane; the knowledge on the part of people at the Tecumseh plant and at Du Pont's Regulatory Affairs Group in Wilmington that the use of PEG in manufacturing cellophane would result in DEG in the finished product; and the ability of Du Pont to identify its cellophane. *Id.* It fur-

ther claims that some of the witnesses and documents are now outside of Du Pont's control. The employees and documents of the Tecumseh plant are now in the control of Flexel, and other former Du Pont workers are now retired. *Id.* Those witnesses and documents would not be readily available for trial if the case were heard in West Germany.

Du Pont, for its part, has denied that PEG in the manufacturing process causes DEG to be present in cellophane. App. at 28. It claims that critical evidence necessary to its defense and to the proof of damages is located in Europe. For the most part, it does not specifically identify, but rather asserts the presence of, documents and witnesses regarding the following: the causal link between the presence of any DEG in Du Pont cellophane and Haribo's termination of its business relationship with Lony; tests done in Europe allegedly establishing the presence of DEG in the cellophane; the life history of the cellophane after it entered Lony's control which might explain the presence, or an increased level, of DEG in the wrappers; the claim that it was Du Pont cellophane that was used in the wrappers; and the amount of Lony's damages. Appellee's Brief ("Applee's Br.") at 8–10. Du Pont asserts that those witnesses and documents would not be readily available if the case were heard in the United States.

## III. DISCUSSION

■ Our scope of review in this matter is limited. The motion to grant or deny a *forum non conveniens* motion lies within the sound discretion of the district court. "[W]here the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference." *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 257, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).[2] Therefore, "our re-

2. In *Piper,* representatives of the estates of several citizens and residents of Scotland who were killed in an airplane crash in Scotland brought wrongful-death suits in the United States against the company that manufactured the airplane in Pennsylvania and the company that manufac-

tured the plane's propellers in Ohio. 454 U.S. at 257, 102 S.Ct. at 266.

The plaintiffs admitted that the action was filed in the United States because its substantive law was more favorable to them. The Supreme Court reversed our reversal of the district

view is limited to consideration of whether the district court abused its discretion, and we do not perform a *de novo* resolution of forum non conveniens issues." *Lacey v. Cessna Aircraft Co.* 862 F.2d 38, 43 (3d Cir.1988).

We have previously stated that a district court abuses its discretion in a *forum non conveniens* analysis when it fails to consider adequately and to determine the amount of deference due the foreign plaintiff's choice of forum (*Id.* at 45–46) or when it clearly errs in weighing the factors to be considered. *Id.* at 43 (citing *Reyno v. Piper Aircraft Co.*, 630 F.2d 149, 160 (3d Cir.1980).

We have recently restated the grounds for dismissing a case for *forum non conveniens* in *Lacey*, 862 F.2d at 38, which came out shortly before the ruling in this case and was first brought to the attention of the district court in the motion for rehearing. In *Lacey*, as in the instant case, the plaintiff was not a United States citizen or resident and the defendant was a Pennsylvania manufacturer of the product that allegedly was responsible for the damage.[3] The standard is stated as follows:

A district court may, in the exercise of its sound discretion, dismiss a case "when an alternative forum has jurisdiction to hear the case, and when trial in the chosen forum would 'establish ... oppressiveness and vexation to a defen-

dant ... out of all proportion to the plaintiff's convenience,' ... *Piper*, 454 U.S. at 241, 102 S.Ct. at 258.... (*quoting Koster [v. American Lumbermens Mutual Casualty Co.]*, 330 U.S. [518] at 524 [67 S.Ct. 828, 832, 91 L.Ed. 1067] [(1947)] ). In deciding whether to dismiss a case for forum non conveniens, "the ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice." *Koster*, 330 U.S. at 527, 67 S.Ct. at 833....

. . . .

... However, the plaintiff's choice of forum should rarely be disturbed, unless the balance of factors is strongly in favor of the defendant.

*Lacey*, 862 F.2d at 42–43. The opinion also emphasizes that the defendant bears the burden of persuasion as to all elements of the *forum non conveniens* analysis. *Id.* at 43.

Determinations of *forum non conveniens*, unlike issues of jurisdiction, are not solely questions of law. *Pain v. United Technologies Corp.*, 637 F.2d 775, 781 (D.C.Cir.1980). "[R]ather they represent exercises of structured discretion by trial judges appraising the practical inconveniences posed to the litigants and to the court should a particular action be litigated in one forum rather than another." *Id.* (footnote omitted); *see also In re Air Crash Disaster Near New Orleans*, 821

court's dismissal of the suit on grounds of *forum non conveniens,* holding that the possibility of a change in substantive law should ordinarily not be given conclusive or even substantial weight in the inquiry. *Id.* at 247, 102 S.Ct. at 261. That is not at issue here because neither side has discussed possible differences in the substantive law of the two forums, nor has the district court. In addition, the Supreme Court held that we had used an incorrect standard of review and had substituted our judgment for that of the district court, rather than merely reviewing for abuse of discretion. *Id.* at 257, 102 S.Ct. at 266. Here, we have deferred to the district court's weighing of the evidence where its judgment was not unreasonable and therefore was within its discretion.

Furthermore, in *Piper,* there were other potential defendants who might have been solely liable who were not parties to the action, including the "pilot, who had obtained his commercial pilot's license only three months earlier, [and]

was flying over high ground at an altitude considerably lower than the minimum height required by his company's operations manual" and the companies that maintained and operated the plane. *Id.* at 239, 102 S.Ct. at 257. In the instant case, Du Pont mentioned possible outside sources of DEG as theoretical possibilities, but the case will fail unless Lony can prove that the Du Pont cellophane contained DEG as manufactured. If Lony can prove its case, possible outside sources of contamination would relate only to an increased level of DEG, which would be very unlikely to relieve Du Pont of all liability if its cellophane as manufactured did contain DEG.

3. In *Lacey*, the plaintiff, who was Australian, had a choice of two forums, both of which were foreign: Pennsylvania, where the allegedly defective exhaust system of an airplane was manufactured, and British Columbia, where the air crash occurred.

F.2d 1147, 1165 (5th Cir.1987). We described the task as follows:

A district court entertaining a forum non conveniens motion must first decide whether an adequate alternative forum exists to hear the case. Furthermore, the court should also consider that a foreign plaintiff's choice of an American forum is entitled to less deference than an American citizen's choice of his home forum. If there is an adequate alternative forum, the district court must consider and balance several private and public interest factors that are relevant to the forum non conveniens determination.

*Lacey*, 862 F.2d at 43 (citations omitted) (footnote omitted).

The appellant Lony claims that in dismissing the suit on grounds of *forum non conveniens* the district court abused its discretion in several respects. Lony contends the court accorded no deference to Lony's choice of forum, placed the burden of persuasion on the plaintiff rather than on the defendant where it belonged, and clearly erred in weighing the private and public interest factors, making several omissions and errors of law and fact. We shall review each of Lony's claims.

### A. The Availability of an Adequate Alternative Forum

■ We noted that, under *Piper*, a district court must "consider the availability of an adequate alternative forum and the amount of deference to be accorded the plaintiff's choice of forum before it weighs the private and public interest factors relevant to the forum non conveniens inquiry." *Lacey*, 862 F.2d at 45 (citation omitted). Lony apparently does not appeal the district court's finding that West Germany is an adequate alternative forum. As the Supreme Court stated in *Piper*, "[o]rdinarily, this requirement will be satisfied when the defendant is 'amenable to process' in the other jurisdiction," except in the "rare circumstances ... where the remedy offered by the other forum is clearly unsatisfactory," such as when "the alternative forum does not permit litigation of the subject

matter of the dispute." *Piper*, 454 U.S. at 255 n. 22, 102 S.Ct. at 265 n. 22. In this case, two conditions of dismissal were Du Pont's submission to the jurisdiction of the West German courts and the West German courts' willingness to entertain at least one of Lony's claims. App. at 930–31. Moreover, Lony does not maintain that any remedy available in West Germany would be "clearly unsatisfactory." Lony argues, rather, that the district court improperly shifted the burden of persuasion from the defendant, where it should have been, to the plaintiff, in this and in every other aspect of the *forum non conveniens* analysis. Applt's Br. at 26–32. This is not a case such as *Lacey*, where the defendant presented *no* evidence on the alternative forum and the district court still dismissed the case. *Lacey*, 862 F.2d at 44. The district court did seem to look to the plaintiff to show that the alternative forum was not adequate, rather than looking to the defendant to show that it was adequate; but since the defendant did put forward some evidence on the adequacy of the alternative forum and since Lony does not challenge the specific finding that the alternative forum is adequate, we find that the district court's ruling on this point does not constitute reversible error.

### B. Amount of Deference Due Plaintiff's Choice of Forum

■ Ordinarily, great deference is accorded a plaintiff's choice of forum, but the amount of deference due is less when the plaintiff is foreign. *Piper*, 454 U.S. at 255, 102 S.Ct. at 265. But *"Piper*'s language about according less deference to a foreign plaintiff's forum choice is 'not an invitation to accord a foreign plaintiff's selection of an American forum *no* deference since dismissal for forum non conveniens is the exception rather than the rule.'" *Lacey*, 862 F.2d at 45–46 (citation omitted). In deciding how much deference to accord a foreign plaintiff's choice, we must consider the reason the *Piper* court gave for saying that it was due less deference:

When the home forum has been chosen, it is reasonable to assume that this choice is convenient. When the plaintiff

is foreign, however, this assumption is much less reasonable. Because the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference.

*Piper*, 454 U.S. at 255–56, 102 S.Ct. at 266 (footnote omitted).

■ Because the reason for giving a foreign plaintiff's choice less deference is not xenophobia, but merely a reluctance to assume that the choice is a convenient one, that reluctance can readily be overcome by a strong showing of convenience. In ruling on a *forum non conveniens* motion, the district court must indicate the amount of deference it is giving to plaintiff's choice. *Lacey*, 862 F.2d at 45. Where a foreign plaintiff has made a strong showing of convenience, we hold that the district court must indicate how far that showing goes toward putting the foreign plaintiff on the same footing as a domestic plaintiff.

The district court had the following to say on the amount of deference due plaintiff's choice of forum:

> [L]ess deference is given to a plaintiff's choice of forum where the plaintiff is not a United States citizen or resident.
>
> As this Court stated in [*Dawson v. Compagnie Des Bauxites de Guinee*, 593 F.Supp. 20 (D.Del.1984), *aff'd mem.*, 746 F.2d 1466 (3d Cir.1984)], "When a plaintiff is a foreign citizen and is not suing in his home forum, the presumption of ... plaintiff's convenience is less reasonable and his choice deserves less deference." Thus, in the case before us, the choice of Delaware as the forum in which to bring this action by the plaintiff, a West German business, has less significance in determining whether to keep this action here than it normally would.

App. at 918–19 (citations omitted).

■ Lony maintains that the district court merely restated the rule, failed to say how much deference it gave to the plaintiff's choice of forum, as required by *Lacey*, and, in fact, gave it no deference at all. Applt's Br. at 27; Applt's Reply Br. at 1. Du Pont reads the district court's statements as indicating that the court considered the question and granted some deference to the plaintiff's choice, but found that dismissal was nonetheless warranted. Applee's Br. at 16–17.

We cannot say that the district court gave no deference at all to plaintiff's choice of forum, but it did little beyond restating the rule and filling in the names of the parties. In this case, more than that is required of the district court. The foreign plaintiff is suing the defendant in the latter's home forum where the latter's corporate headquarters, headquarters of the division in question, and research laboratories are located. That in itself has considerable weight in showing that the plaintiffs choice was based on convenience. In addition, the plaintiff has taken pains to show that much of the evidence it needs to establish liability is located in the forum it chose, and the conduct that caused the alleged injury issued from Delaware. If the plaintiffs do not prove liability, they have lost the case; thus, particularly where the liability evidence predominates in the plaintiff's choice of forum, the court should be quite cautious in disregarding such an essential fact of the litigation.

The district court must assess whether the considerable evidence of convenience has in this case overcome any reason to refrain from extending full deference to the foreign plaintiff's choice. It must decide just how much less deference is due this plaintiff's choice of forum, if, indeed, it is due any less than that of a domestic plaintiff. The district court's failure to give adequate consideration to these questions and to make a determination based on the facts of this case was an abuse of discretion and constitutes reversible error.

## C. *Private Interest Factors*

In *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), the Supreme Court stated that the relevant private interest factors to be considered in a *forum non conveniens* analysis include

> relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost

of obtaining attendance of willing, witnesses; ... and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforceability of a judgment if one is obtained.

*Id.* at 508, 67 S.Ct. at 843; *see also Piper,* 454 U.S. at 241 n. 6, 102 S.Ct. at 258 n. 6; *Lacey,* 862 F.2d at 46. Moreover, as the Supreme Court recently stated:

> To examine "the relative ease of access to sources of proof," and the availability of witnesses, the district court must scrutinize the substance of the dispute between the parties to evaluate what proof is required, and determine whether the pieces of evidence cited by the parties are critical, or even relevant, to the plaintiff's cause of action and to any potential defenses to the action.

*Van Cauwenberghe v. Baird,* 486 U.S. 517, 108 S.Ct. 1945, 1953, 100 L.Ed.2d 517 (1988) (quoting *Gulf Oil,* 330 U.S. at 508, 67 S.Ct. at 843).

The district court in the instant case noted the private interest factors set forth in *Gilbert,* and introduced its analysis with the statement that "[e]ach of these factors ... favors dismissal." App. at 920. After completing its analysis of the private interest factors, however, the court seemed to depend on its erroneous treatment of the deference due a foreign plaintiff's choice of forum. It stated, "Thus, remembering that 'when a plaintiff is a foreign citizen and is not suing in his home forum, the presumption of ... plaintiff's convenience is less reasonable and deserves less deference,' we find that the balance of private factors, if not at equipoise, is tipped toward dismissal." App. at 924.

■ Insofar as the district court's assessment of the balance depended on the court's apparent view that less deference is always due the foreign plaintiff's choice of forum, that will have to be re-examined when the district court inquires on remand into whether less deference is due the choice in this case, and if so, how much less. Since that view seemed to affect the court's assessment of the balance of private interest factors, we assume that without it the court would have found the balance of those factors either at equipoise or tipped toward the plaintiff.

Even without that correction, Lony correctly challenges the legal significance that the district court gave its assessment of the private interest factors. The district court found that "the balance of private factors, if not at equipoise, is tipped toward dismissal." App. at 924. We agree that this is an erroneous conclusion. If the balance of private interest factors is close to equipoise, as the district court found it to be, that would not favor dismissal. Du Pont had the burden of establishing that "trial in the chosen forum would 'establish ... oppressiveness and vexation to a defendant.... out of all proportion to plaintiff's convenience.'" *Piper,* 454 U.S. at 241, 102 S.Ct. at 258. When the court found the private interest factors to be "at equipoise" (or tipped toward the defendant), it should have concluded that they weighed in favor of retaining jurisdiction, not that they tipped "toward dismissal." App. at 930.

■ We shall next review the court's assessment of the specific private interest factors for plain error, apart from its dependence on an assumption of lesser deference due the choice of forum of a foreign plaintiff and the significance it gave to its finding that the private interest factors were almost evenly balanced.

The district court set out Lony's two liability issues as presented in its brief as follows: "(1) Is DEG present in cellophane manufactured using PEG 300 as a raw material? And, (2) If so, did DuPont know or should it have known this?" The court acknowledged that "it is true that many witnesses are located in the United States." App. at 921. It reasoned, however, that the first issue could be proved by European experts as easily as by Du Pont's experts in the United States. On the issue of knowledge, the court found that its condition that Du Pont "make available, and translate into German where appropriate at its own expense, any documents, witnesses or other evidence in its custody or control" would provide all the evidence Lony needed. App. at 921.

In addition, the court noted that Lony could make available persons and documents in the United States outside of Du Pont's control by using procedures established by the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Convention"), *opened for signature* March 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444. App. at 921–22. Rejecting Lony's claim that trial in West Germany would result in the unavailability of much important evidence, the court found that dismissal "may actually result in more evidence being available in a West German courtroom." App. at 922. The court based this assertion on its belief that under Hague Convention procedures the evidence available to litigants in Germany seeking assistance from the United States might be broader than that available to litigants in the United States seeking assistance from West Germany. *Id.* Finally, the district court found that much of the evidence as to the causation of Lony's alleged injuries and as to damages was in West Germany. *Id.*

Lony does not dispute the correctness of the district court's statement of the two liability issues. Applt's Br. at 35. It contends, however, that the district court ignored the "massive factual record of potential witnesses in this case" that Lony had provided, and required DuPont to present "no evidence whatsoever" on its interests in changing the forum. *Id.* at 33–34. Lony claims that, as a result, not only was the burden of persuasion improperly shifted, but the court reached an erroneous conclusion.

As noted above, the district court is entitled to determine whether the evidence offered by the parties is "critical, or even relevant" to prove or defend the claims; indeed, it must do so to assess properly the relative ease of access to sources of proof. *Van Cauwenberghe*, 108 S.Ct. at 1953. This means that, while it may not simply ignore sources of evidence presented by Lony, the court may judge them to be unnecessary or irrelevant.

With regard to the first liability issue, Lony identifies various persons who are or were employed by Du Pont who could testify as to the use of PEG 300 in manufacturing the type of Du Pont cellophane Lony ordered. The court rightly concluded that this testimony is unnecessary. Since Du Pont has admitted that it used PEG in the manufacture of the type of cellophane Lony purchased, Lony does not need evidence located in the United States to show that Du Pont used PEG 300; it does not need any evidence at all on that point.

Lony also identifies evidence in the United States that it claims is needed to establish that the PEG 300 used in the manufacture of Du Pont cellophane type K160DB23 was responsible for DEG in the finished product. Du Pont's position, which the district court adopted, is that any expert witnesses could provide Lony with the testimony that the use of PEG as a raw material in the manufacturing process will result in DEG in the finished cellophane. Accordingly, Du Pont argues that witness on this point could easily be obtained in Europe. App. at 921. Since Du Pont denies that the use of PEG as a raw material caused DEG to be present in its cellophane, however, it seems disingenuous of Du Pont to claim that Lony can make do with witnesses who are and were unconnected with Du Pont. At trial, Du Pont would doubtless try to refute the testimony of the foreign witnesses that it claims are all Lony needs. Lony wants to put on witnesses who were working for Du Pont at the Tecumseh plant when the cellophane was manufactured there and who would testify to the manufacturing process used by Du Pont and the way in which the DEG could get from the PEG into the cellophane in that process. Applt's Br. at 9–14. Because Du Pont contests Lony's claim that the PEG it used in the manufacturing process resulted in DEG in the cellophane, Lony should not have to make do with a presentation of evidence that may not withstand the defense Du Pont would mount, but should be entitled to prove its claim in the most direct and specific manner possible, linking the DEG in the cellophane to Du Pont's own manufacturing process. The district court's conclusion that Lony needs no access to sources of proof in the United States to prove the first issue is not war-

ranted. Lony would be greatly inconvenienced by not having ready access to this evidence in the United States.

With regard to the second liability issue, Du Pont's knowledge that PEG in the manufacturing process would result in DEG in the cellophane, Lony claims that some of that information can be provided by documents and witnesses from the Tecumseh plant, which are outside Du Pont's control, and some by documents and witnesses in Du Pont's control in Wilmington. Applt's Br. at 17–19. Some of this evidence may be cumulative, but, since Du Pont is denying knowledge, Lony should be able to put forth whatever evidence it can as to the extent of Du Pont's alleged knowledge, and should not be limited to proving what someone in Du Pont's Wilmington headquarters knew or should have known. Since Du Pont has agreed, as a condition of dismissal, to make available to the German courts all of the evidence within its control, then its documents and personnel in Wilmington would be readily available for trial in Germany. However, the evidence provided by documents from the Tecumseh plant and by witnesses who work there or formerly worked there would not be readily available in Germany since they are no longer in Du Pont's control.[4] Lony would be slightly inconvenienced by not having access to it.

With regard to evidence located in Europe that Du Pont claims it needs, the court found that much of the evidence as to causation of Lony's alleged injuries and damages is in West Germany:

> Specifically, all of the DEG test results conducted in Germany by Haribo and the West German Government on the wrappers that were allegedly made of DuPont cellophane are in West Germany.... Information as to why Haribo terminated its business relationship with Lony exists in West Germany, not here. Information as to the amount of damages, both actual and those related to the loss of Lony's business reputation, that Lony allegedly suffered because of Haribo's termination [is] in West Germany.

App. at 922–23.

Lony asserts that much of the evidence Du Pont claims it needs is unnecessary because Du Pont can identify its own cellophane by performing tests on it. App. at 192, 218. Therefore, by testing the rejected wrappers that Haribo returned to Lony, Du Pont can determine that the cellophane is its own. If true, it would make unnecessary evidence in West Germany proving the chain of control of the cellophane to show that the wrappers were actually made of the Du Pont cellophane. Lony also claims that the test results from Germany and German evidence on possible outside sources of contamination of the wrappers would be irrelevant, since Lony plans to prove that the DEG was present in the cellophane as manufactured.[5] This evi-

---

4. Du Pont claims that under its agreement of sale with Flexel it can get documents from the Tecumseh plant, but Lony alleges that the contract only allows Du Pont reasonable access to records for preparing tax returns and does not give Du Pont the right to secure the documents Lony requires to use for trial in West Germany. Applt's Reply Brief at 11. The agreement of sale between Du Pont and Flexel specifies that Flexel shall allow Du Pont reasonable access to the books and records that Du Pont transferred to Flexel "for the purpose of enabling [Du Pont] to prepare and support its various tax returns and verifying its quality control procedures with respect to filled orders, ..." App. at 601. Since Lony alleges that the DEG in the cellophane resulted not from any lapse in quality control but, rather, from the use of PEG in Du Pont's process of manufacturing this type of cellophane, the document seems to support Lony's position.

5. In addition to claiming that outside sources of contamination might be responsible for any DEG in the cellophane, Du Pont claims that outside sources might be responsible for an increased level of DEG in the cellophane. We are unwilling to say, as does Lony, that the level of contamination is completely irrelevant simply because Haribo required that the cellophane contain no DEG and that Du Pont certified that it contained none. However, if Lony established that Du Pont's cellophane as manufactured contained DEG, then Du Pont's search for outside sources in Europe that increased the level of contamination has more the appearance of a fishing expedition than of an effort to locate essential evidence.

The district court notes in its ruling that Lony fails to allege that the levels of DEG in the cellophane exceeded the amount allowable under West German standards. App. at 923. The absence of such an allegation is irrelevant if, as

dence in Europe is considerably less significant if Lony can prove that the cellophane contained DEG as manufactured and that Du Pont can identify its cellophane conclusively.[6] Barring such proof, Du Pont is considerably inconvenienced by not having ready access to the evidence it claims it needs for its defense, but Lony's case is correspondingly considerably weakened.

With regard to the reasons for Haribo's termination of business with Lony and the damages, we agree with the district court that critical information is located in Europe. Lony claims that the evidence Du Pont needs relating to damages is in Lony's control, but Du Pont is entitled to go beyond the information in Lony's records, and clearly the evidence of damage to reputation is not all in Lony's control. Du Pont is greatly inconvenienced by not having this evidence readily available.

We find that each of the parties has correctly identified some important evidence in the forum of its choice and that the district court correctly ruled that not all of the evidence so identified was necessary. While we might have found that somewhat more of the evidence located in the United States to be necessary to a proper determination of the case on its merits than did the district court, we will reserve judgment as to whether the district court abused its discretion in its assessment of the private interest factors until we have reviewed all of them.

The next question is the availability of compulsory process to compel the presence of unwilling witnesses and the production of documents in each jurisdiction. The district court found that the use of the Hague

Convention might result in more information being available if the trial were held in West Germany. App. at 922. We find that that conclusion is a misreading of the Hague Convention as it is affected by the procedural law of the respective countries.[7]

In trials held in Germany, the parties do not direct the investigation to the same extent that they do in the United States.[8] They may recommend that the court call certain witnesses or seek certain information, but the court may decide that it does not need them. There is no pre-trial discovery. The trial may be a long, rambling event, held intermittently over a period of months, during which the court will call for whatever evidence it deems necessary. In general, considerably less evidence is sought and introduced in a commercial trial in Germany than in a comparable suit in the United States, largely because in West German trials parties do not have access to an equivalent of our pre-trial discovery. In the parties' discussion of the private interest factors, there is some confusion as to what evidence would be available if the trial were held in West Germany. In a *forum non conveniens* analysis we, like the district court, will not consider the fact that the West German courts typically choose not to call for the same amount of information as would be produced for trial in the United States. We will consider only the relative ease of access to the evidence and the availability of compulsory process to compel witnesses or documents should the court wish to request them.

The West German courts have very limited power to order documents and none to compel their production. With regard to documents in West Germany, their produc-

---

Lony claims and Du Pont does not contest, that level was of no importance to Haribo.

**6.** A former Du Pont employee testified that Du Pont had used an identifying agent in its cellophane, but that he could not recall whether its use had been discontinued before the date of the sale in question. App. at 195. Apart from that, he thought that Du Pont cellophane could probably be identified analytically because much of it contained recycled material. App. at 192, 218. Thus the testimony leaves unclear whether or not Du Pont could conclusively identify the cellophane as its own.

**7.** For a discussion of the relationship between the Hague Convention and the Federal Rules of Civil Procedure, *see* Weis, *The Federal Rules and the Hague Conventions: Concerns of Conformity and Comity,* 50 U.Pitt L.Rev. 903 (1989).

**8.** This summary of German civil procedure as it interacts with the Hague Convention is taken from two sources, Kaplan, von Mehren and Schaefer, *Phases of German Civil Procedure I,* 71 Harv.L.Rev. 1193 (1958) and Heck, *U.S. Misinterpretation of the Hague Evidence Convention,* 24 Colum. J. Transnat'l L. 231 (1986).

tion could not be compelled regardless of where the trial was held, although testimony relating to them might be ordered for specific documents. There are no fishing expeditions for documents such as often occur in discovery in the United States.[9]

With regard to documents in the United States, a wide range of them could be compelled if the trial were held in this country; if the trial were held in Germany, few of them could be requested by the German courts through the Hague Convention because of German procedural rules that limit requests for documents for use in West German trials. Du Pont has agreed to make its documents available in Germany, but third party documents such as those in the control of Flexel would not be available under that agreement. Overall, considerably more evidence in the form of documents would be available if the trial were held in the United States.

With regard to the testimony of witnesses, the difference in availability of evidence is not as great as the difference in the availability of documents, at least not in this case. In Germany, parties need not testify, even as to the contents of their documents, but that immunity would be waived as to Du Pont because one condition of dismissal is that Du Pont make available to the German courts all witnesses and documents within its control. In either forum, the courts can compel testimony from third parties within their jurisdictions, and either country will honor requests from the other for the testimony of witnesses.

The district court stated that if the case were tried in Germany more evidence might be available because "there is a question of whether West Germany will execute letters rogatory for the purpose of pretrial discovery ..." App. at 922. We are uncertain what prompted this conclu-

sion of the district court. The West German courts have indicated that they will execute letters rogatory for pretrial discovery to the extent that they would order such evidence if the case were tried in their own courts, that is, they will order the examination of witnesses, but not the production of documents.[10] They could not compel those documents for trial in Germany. Therefore the district court was in error in suggesting that evidence that the German courts might refuse to provide for pretrial discovery in response to letters rogatory would be available were the trial held in Germany.

In considering whether the "choice of one forum over the other will alleviate practical problems, making trial of the case expeditious and inexpensive," the practical problem of the need to translate documents and the testimony of witnesses is a relevant concern. *Dahl v. United Technologies Corp.*, 632 F.2d 1027, 1031 (3d Cir. 1980). Lony claims that none of the potential witnesses from Du Pont speaks German, and that most of the potential German witnesses speak English. Applt's Br. at 20. It adds that while "[n]umerous English documents will have to be translated into German," *id.* at 38, "DuPont's interrogatory responses disclosed that it had already translated into English much of the German correspondence in this action." *Id.* at 20 (citing App. at 89). Du Pont responds that Lony greatly exaggerates its need for documents and witnesses in the United States to prove its claims that there was DEG in the cellophane and that Du Pont knew of it. Applee's Br. at 32. It adds that "[a]ll other issues ... will be centered in Germany" and that Germany is therefore the more convenient forum in terms of language concerns. *Id.*

The district court set as a condition of dismissal that Du Pont translate into Ger-

---

**9.** In *Corning Glass Works v. International Telephone and Telegraph Corp.*, No. 76–0144 (W.C.Va. filed July 14, 1976), a U.S. District Court issued a Letter of Request asking both for third-party production of documents and for deposition testimony in connection with pretrial discovery in the United States. The Bavarian Ministry of Justice denied the request for production of documents, but allowed deposition

testimony about those documents to be taken. The Court of Appeals in Munich upheld the decision. Judgment of Nov. 27, 1980, Oberlandesgericht, Munich, 1981 JZ 538. This case is reproduced in Applt's Reply Br., Appendix 2.

**10.** *Id.*

man at its own expense any evidence in its control which a German court requested, but otherwise did not discuss the language issue. It seems that more of the German witness speak English than the reverse, but there is evidence and testimony on both sides that would have to be translated. We cannot say that the balance favors one side or the other, and evidently the district court did not find that it did either. The district court made no finding as to the relative costs of trying the case in the two forums and neither party raised the issue on appeal.

Overall, we find that important evidence relevant to claims and defenses is located in each forum and that the Hague Convention procedures assure that some evidence from each forum will be available in the other. The most important difference is that numerous documents in the United States outside of Du Pont's control will not be available in Germany. While we might find the balance of private interest factors tipped slightly in favor of the plaintiff, the district court's finding that the balance of private interest factors is either at equipoise or tipped toward the defendant is not an abuse of discretion. The conclusion that a balance at equipoise or tipped toward the defendant favors dismissal is, however, an error of law. As this court noted recently, in order to favor dismissal, the analysis must "establish ... oppressiveness and vexation to a defendant ... out of all proportion to the plaintiff's convenience, ..." *Lacey*, 862 F.2d at 42 (quoting *Piper*, 454 U.S. at 241, 102 S.Ct. at 258 (quoting *Koster*, 330 U.S. at 524, 67 S.Ct. at 831–32)).

■ Finally, in its discussion of the private interest factors, as in its discussion of the availability of an alternative forum, the district court consistently focused on whether or not Lony would be unduly inconvenienced by its dismissing the case, rather than on whether Du Pont would be unduly burdened and oppressed by its retaining jurisdiction in the United States. In doing so, it appeared to shift the burden of persuasion from the defendant to the plaintiff. While we do not find the court's weighing of the private interest factors to

be an abuse of discretion, the way in which it went about making its determination was inappropriate as a matter of law.

### D. *Public Interest Factors*

■ In *Piper*, the Supreme Court described the relevant public interest factors in a *forum non conveniens* inquiry as including

> the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home;" the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

454 U.S. at 241 n. 6, 102 S.Ct. at 258 n. 6 (quoting *Gulf Oil*, 330 U.S. at 508, 67 S.Ct. at 843): *see also Lacey*, 862 F.2d at 48. As we further noted in *Lacey*, "[i]n evaluating the public interest factors the district court must 'consider the locus of the alleged culpable conduct, often a disputed issue, and the connection of that conduct to plaintiff's chosen forum.'" 862 F.2d at 49 (citing *Van Cauwenberghe*, 108 S.Ct. at 1953).

The district court noted that "even when the private convenien[ce] of the litigants are nearly in balance, a trial court has the discretion to grant forum non conveniens dismissal upon finding that retention of jurisdiction will be unduly burdensome to the community, that there is little or no public interest in the dispute, or that foreign law would predominate if jurisdiction is retained." App. at 924 (citing *Pain*, 637 F.2d at 791–92). The court found that dismissal was warranted because "the public interest factors strongly favor dismissal." App. at 930. In analyzing the public interest factors, the court looked at three factors: the nexus with the two jurisdictions, local interest in the issues in each jurisdiction, and the interest in having the case tried in a forum familiar with the law that governs the issues. App. at 924–30.

The district court first reasoned that while the case had a nexus with Delaware

because "Du Pont is incorporated in Delaware; Du Pont performed relevant tests of the cellophane in question in Delaware; and the alleged misrepresentations were made from Delaware to West Germany," App. at 925, West Germany had both the larger number of contacts with the dispute and the more important contacts. The court noted that the

> DEG scandal was centered in West Germany; Lony sold the cellophane in question to Haribo in West Germany; Lony and Haribo both have their principal places of business in West Germany; Lony's communications to [Transparent] and DuPont seeking information about the DEG content of the cellophane in question originated from West Germany; Haribo performed its cellophane tests and has records of these tests in West Germany; Haribo terminated its business relationship with Lony in West Germany; and any damage resulting from the termination of this relationship occurred in West Germany.

*Id.*[11]

The court concluded that West Germany has the more important contacts to the litigation (App. at 926) and that it also has the greater number of contacts, though the court gave less weight to the latter factor. Clearly, both forums have important contacts to the litigation. Here again, we might have reached a somewhat different conclusion as to the importance of the contacts with the two forums. In addition to the contacts with Delaware that the district court notes, that is, Du Pont's incorporation in Delaware, its performance of relevant tests there, and the alleged misrepresentations made from Delaware, Du Pont is also the largest private employer in the state, has its corporate headquarters in the state and its cellophane division was run from there at all times relevant to the litigation. But the contest is a close one and we cannot say that the district court abused its discretion in finding that the more important connection was with Germany.

With regard to the second factor, local interest in the dispute, the district court reasoned that West Germany had the stronger local interest because "[t]he DEG scandal was centered in West Germany and Austria." App. at 926. It noted that Delaware had a strong interest because every government has an interest in "ensuring that businesses incorporated or operating within its borders abide by the law." App. at 926. But it found that

> every government also has what we consider a stronger interest in ensuring that its citizens do not come into contact with unsafe products imported within its borders. West Germany is no exception to this rule. There can be no argument that whatever harm occurred from the DEG scandal, it occurred in West Germany, not in Delaware.

App. at 926–27.

The district court implies that the safety of the wrappers was an issue in this case, and suggests that Lony should have alleged that the DEG content of the wrappers exceeded the amount allowable by the West German government as part of its claim as to why Haribo terminated their business relationship. The court notes that "Lony fails to allege at any point that the level of DEG allegedly present in the Du-Pont cellophane exceeded the West German standard of 500 parts per million and, in effect, information as to why Haribo terminated its business relationship with Lony exists in West Germany, not here." App. at 923.

As Lony states, the case is not concerned with "the health dangers of DEG in candy wrappers," but is, rather "a straight commercial [dispute] arising out [of] Lony's requirement [that] DuPont cellophane be absolutely DEG free, and specific representations to that effect by DuPont." Applt's Br. at 46. Lony claims that the case "has nothing whatsoever to do with the levels at which DEG is dangerous to health, or what those levels are considered to be in West

---

11. The court also pointed out that the case had a nexus with Kansas because the cellophane was manufactured there, and with Switzerland because Transparent, a Swiss company, had allegedly made misrepresentations to Lony. App. at 925.

Germany." *Id.* It adds that public concern over the safety of products containing DEG merely formed part of the background to the case and explains Haribo's insistence that the wrappers for its candy contain no DEG.

Du Pont claims that Lony changed its position concerning the relevance of the DEG scandal in Europe, noting that it included three pages of allegations about the DEG scandal in its complaint (App. 4–7) and considerable material in the appendix to its brief to the district court. Applee's Br. at 38. The fact that Lony is now placing less emphasis on the DEG scandal as background to its case does not change the fact that it never alleged that Du Pont's cellophane was unsafe, nor does it make the West German government's interest in this case that of "ensuring that its citizens do not come into contact with unsafe products imported within its borders," as the district court states. App. at 926.

We find that the primary interest of the German government is similar to that of Delaware. Delaware is interested in ensuring that businesses incorporated or operating within its borders abide by the law; Germany is interested in insuring that businesses selling their products within Germany or to German companies abide by the law and do not engage in wrongful business practices or misrepresent their products. In addition, we find that West Germany's interest in the presence of DEG in products sold within its borders is implicated even though this is a commercial dispute and even though there is no allegation that the amount of DEG in the product exceeds the allowable West German standard. Germany may be particularly concerned with misrepresentations regarding the presence in an imported product of a chemical which has been the subject of a major public health scandal, even if there was no allegation that the level of the chemical present in the product exceeded acceptable limits and even if it did not, in fact, exceed acceptable limits. Insofar as the district court based its assessment of West Germany's stronger interest on its belief that the case deals with the safety of products imported into West Germany, its analysis is flawed, but we cannot say that its conclusion that West Germany has the stronger interest in the case is an abuse of discretion.

■ The third public interest factor is the applicability of local law. Lony maintains that the district court erred in determining that West German law would apply to its claim of intentional misrepresentation and in ignoring its claims under Delaware statutes. We agree.

If the case were heard in Delaware, the district court would, in a diversity case, apply the choice of law rules of Delaware, the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The district court found that the application of Delaware's choice of law rules did not produce a clear result, and turned to the Restatement (Second) Conflict of Law § 148.2 (1971) for guidance. App. at 927–29. The district court noted that "[i]n *Johnston Associates, Inc. v. Rohm & Haas, Inc.*, 560 F.Supp. 916 (D.Del.1983), this Court held that in the case of intentional torts, of which misrepresentation is one, Delaware choice of law rules require that the law of where 'the defendant's wrongful conduct primarily occurred' apply. *Id.* at 918. This might direct us to Delaware law." App. at 927 (emphasis added). On the other hand, the court noted that an earlier case, *Autrey v. Chemtrust Industries Corp.*, 362 F.Supp. 1085 (D.Del.1973), which had not been overruled, stated that in misrepresentation cases, "the wrong is deemed to occur where the misrepresentation operated to cause injury." *Id.* at 1090. This suggested to the court that West German law should apply. Next, apparently because of the inconsistency in the cases, the court turned to the section of the Restatement dealing with misrepresentation and fraud, undertook an analysis based on six factors stated there, and concluded that the law of West Germany would apply. This, combined with the district court's conclusion that West German law would apply to other causes of action in the case, led the court to conclude that the public interest factors strongly favored dismissal.

We find that resort to the Restatement is not necessary because there is no conflict between the two cases cited on Delaware choice of law rules. *Autrey* involved charges brought by chemical products distributors and dealers against a manufacturer for *negligent* representations that were made in a "willful, wanton, or reckless manner." 362 F.Supp. at 1089. In *Johnston*, a case of alleged tortious interference with a contract, *intentional* misrepresentation was alleged. The court in *Johnston* distinguished cases of negligent misrepresentation from those of intentional misrepresentation in making its choice of law analysis, thus implicitly, if not explicitly, distinguishing *Autrey*. It held that "[t]he application of the place of injury rule … is appropriate only in the case of negligent torts. 560 F.Supp. at 918 (citing *Marra v. Bushee, rev'd in part*, 447 F.2d 1282 (2d Cir.1971). But "[i]n the case of intentional torts, the courts have preferred to apply the law of the defendant's place of conduct rather than the place of injury." *Id.*

In this case, the place of injury was Germany, but the place of the alleged wrongful conduct, the misrepresentation that allegedly caused the injury, was Delaware. Therefore, Delaware law will apply to Lony's claim of intentional misrepresentation. Lony did not dispute the district court's finding that West German law would apply to Lony's negligent misrepresentation and warranty claims. App. at 929.

Lony also points out that the district court did not even mention the fact that Lony had two causes of action based on Delaware statutes designed to ensure that its corporate citizens do not conduct business in a deceptive, unfair or misleading manner. Applt's Br. at 46–47. The statutes are the Delaware Consumer Fraud Act, Del.Code Ann. tit. VI §§ 2511–27 (Supp.1988) and the Deceptive Trade Practices Act, Del.Code Ann. tit. VI §§ 2532(a)(12) (Supp.1988). Du Pont takes the position that the relevant statutes "probably do not apply to the facts that Lony alleges in its complaint" (Appellee's Br. at 43) because Lony claimed that the misrepresentations took place "in connec-

tion with the sale of DuPont merchandise" (*id.* at 44 (quoting Applt's Br. at 23)) when actually the alleged misrepresentations occurred subsequent to the sale. Du Pont cites no authority for its contention that "in connection with" a sale cannot apply to a representation made subsequent to a sale, but prior to a resale that allegedly resulted in the damage in this case. Furthermore, it offers no reason as to why the Consumer Fraud Act would not apply. Lony certainly has a colorable claim under both these statutes, and Delaware has an interest in seeing these laws enforced. The district court erred in failing to consider them in its discussion of the public interest factors.

With regard to the public interest factors as a whole, we find the court clearly erred in concluding that they "strongly favor dismissal." App. at 930. With regard to the first factor, the importance of contacts with each forum, the balance is close and we cannot say that the district court abused its discretion in concluding that the contacts with West Germany were more important. With regard to the second factor, public interest in the case, again, the balance is close and we cannot say the court's decision that West Germany had the greater interest was an abuse of discretion. On the third factor, however, the applicability of local law, the court erred in its conclusion as to the choice of law in intentional misrepresentation and in its failure to discuss the claims under Delaware statutes. This factor favors Delaware law and therefore weighs in favor of retaining jurisdiction. When we balance all three factors, we find that the district court's conclusion that the public interest factors "strongly favor dismissal" is clearly in error and an abuse of discretion.

## IV.   CONCLUSIONS

For the foregoing reasons, we find that the district court abused its discretion in failing to consider adequately and to make a determination of the amount of deference due the plaintiff's choice of forum. In addition, the court clearly erred in the conclusion it drew from its weighing of the private interest factors, in its determination

of the choice of law that applied to plaintiff's claim of intentional misrepresentation and in its failure to consider plaintiff's claims under Delaware statutes.

We will vacate the order of dismissal and will remand the matter to the district court for reconsideration of the *forum non conveniens* motion in light of this opinion and for further proceedings consistent with this opinion.